**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Molly La Fond**<br>6429 Palmer Park Circle South, #308<br>Columbus, Ohio 43213 | : | |
| **Plaintiff,** | : | Case No. |
| v. | : | Judge |
| **NetJets Aviation, Inc.**<br>4111 Bridgeway Avenue<br>Columbus, Ohio 43219 | : | Magistrate |
| **Defendant.** | : | |

**COMPLAINT**
**(Jury Demand Endorsed Hereon)**

Now comes Plaintiff Molly La Fond ("Plaintiff"), by and through undersigned Counsel, and states the following as her Complaint for claims arising under the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, against Defendants NetJets Aviation, Inc. ("Defendant"):

**JURISDICTION AND VENUE**

1. The Court has jurisdiction over Counts I-V pursuant to 28 U.S.C. §1331, because the claims are set forth pursuant to the laws of the United States.

2. Venue is proper pursuant to 28 U.S.C. §1391, because the events giving rise to Plaintiff's claims occurred in Franklin County, Ohio, within the Southern District of Ohio, Eastern Division.

## THE PARTIES

3. Plaintiff is a natural person residing in Franklin County, Ohio. At all relevant times, Plaintiff was an employee of Defendant NetJets.

4. Defendant is a private business jet charter and aircraft management company.

## FACTS

5. Plaintiff has been diagnosed with health conditions, including but not limited to depression and anxiety, that qualify as disabilities under O.R.C. 4112.01(A)(13). When Plaintiff is having symptoms of depression and anxiety, she is substantially limited in the major life activities of seeing, sleeping, speaking, breathing, concentrating, thinking, communicating, and working.

6. Defendant hired Plaintiff as an Aircraft Dispatcher on February 23, 2015.

7. Plaintiff was held to a different standard of work performance than her male coworkers. Plaintiff complained about this and other issues beginning shortly after her hire.

8. After Plaintiff complained about gender discrimination, her supervisors knowingly and intentionally assigned her an excessive and unachievable workload for the purpose of justifying discipline and/or termination. Plaintiff's supervisors unfairly scrutinized her work in order to justify discipline and/or termination.

9. Plaintiff complained weekly to Dana Weigle, Director of Flight Support, and other supervisors about fixing incorrect attendance, paid time off, and paychecks that resulted in unpaid time worked. Each time Plaintiff complained, she faced retaliation for complaining about pay.

10. During May 2016, Plaintiff complained to Jared Harston, Supervisor, Tactical Manager/Trainer Flight Support, that Jim Williamson, a male dispatcher, scrutinized

Plaintiff's work, as well as the work of other female employees, and he did not do this to male employees. Plaintiff explained to Mr. Harston that Mr. Williamson's inappropriate behavior made her uncomfortable, constituted harassment, and contributed to a toxic work environment for female employees. Plaintiff informed Mr. Harston that management's failure to take any corrective action required her to confront Mr. Williamson herself in an attempt to prevent further harm by Mr. Williamson. Mr. Harston failed to take any action to stop Mr. Williamson's overly aggressive scrutiny of Plaintiff's work.

11. During June 2016, Plaintiff complained to Dana Weigle, Director of Flight Support, that her workload was over assigned and unachievable. Mr. Weigle advised Plaintiff to notify her Shift Supervisors in SocChat, Defendant's instant messaging system, when her workload was unachievable. Thereafter, when Plaintiff's workload was unachievable and created a safety hazard, she would notify her supervisors in SocChat. Plaintiff's supervisors would respond that managers were "monitoring and mitigating the workflow." Her supervisors, however, would assist her male coworkers but not Plaintiff. This caused Plaintiff to get further behind in safety and time sensitive duties.

12. During June 2016, after Plaintiff complained to Mr. Weigle about Mr. O'Neil, Mr. O'Neil asked at least three (3) of Plaintiff's male co-workers to seek out "dirt" on her to support discipline.

13. On June 23, 2016, Plaintiff complained to Mr. Weigle about the impact that her unachievable workload had on safety, her health, and her ability to perform her job duties.

14. During August 2016, Plaintiff participated in NetJets' Pelotonia team with Mr. Weigle and Rick Witschger, a male dispatcher. Mr. Witschger warned Plaintiff to stop speaking up about the way management treated her or she would be "blacklisted." Mr. Witschger informed Plaintiff that Netjets had a history of disregard for confident females.

15. After Mr. Witschger's warning, Plaintiff experienced chest pain, was unable to breathe and felt dizzy, Plaintiff was taken by ambulance to the Emergency Room ("ER").

16. During August 2016, after being taken to the ER, Plaintiff asked Mr. Weigle to assign her to a different supervisor so that she could recover mentally and physically from the hostile work environment created by the discriminatory and retaliatory treatment. Mr. Weigle refused the request.

17. After Plaintiff requested to be reassigned to another supervisor, her workload assignment due times were changed and assigned from 2 hours from arriving for her shift to 20 minutes before flight departure, an unachievable requirement. Plaintiff's similarly situated male coworkers did not have such stringent assigned due times.

18. On or about August 25, 2016, Plaintiff complained to Bill Noe, President, via email about her supervisors withholding resources to complete her job duties. Plaintiff complained that her excessive workload created safety issues. Plaintiff also complained that she was being treated differently than her similarly-situated male coworkers. She complained that she was being retaliated against for complaining about unequal treatment. Mr. Noe was receptive to Plaintiff's complaints and promised to look into her complaints. He urged her to contact him if her concerns continued.

19. After the August 25, 2016 email, Plaintiff complained in person to Mr. Noe about safety issues and discrimination.

20. On or about September 6, 2016, Clark Blake, a male Dispatcher, referred to Plaintiff as a "target" because of her prior complaints.

21. On September 11, 2016, Plaintiff complained to Mr. Weigle about the negative effects the discrimination, harassment and retaliation was having on her health. Plaintiff complained that she had to take FMLA because of the discrimination, harassment and retaliation. Plaintiff complained that Mr. Weigle's failure to assist her harmed her health and caused potential safety issues with her flights.

22. In a follow-up email to Mr. Noe on September 11, 2016, Plaintiff again complained about the terms and conditions of her employment. In addition, Plaintiff complained that her excessive workload created safety issues. Specifically, Plaintiff complained that before she logged on to her computer at the start of a shift, there were trips that had not been evaluated for hazardous weather, advisories, weight and balance, or duty time. Plaintiff also complained that she was not receiving or having access to pertinent, time sensitive FAA compliance notices.

23. After Plaintiff complained to Mr. Noe, her work environment became more hostile. Every time that Mr. Witschger and Mr. Williamson worked with Plaintiff, Mr. Williamson would hover over Plaintiff and scrutinize her work, as well as the work of other female employees, while Mr. Witschger would attempt to instigate conflicts. Mr. Weigle then accused Plaintiff of creating conflicts with her peers. Mr. Weigle required Plaintiff to write statements about the alleged conflicts, but Plaintiff's male coworkers were not disciplined.

24. On or about September 13, 2016, Plaintiff requested medical leave from September 22, 2016 to October 2, 2016 for a disability caused by her work environment. Plaintiff

informed Dana Weigle, Jeff Nagle, Andrew Wuertzer, Ted Bergstrom, Greg Clark, John Tipton, Bill Noe, Jared Harston, Pam Miller, and Jim O'Neil that she required medical leave due to the hostile work environment. Plaintiff also complained that her prior complaints of discrimination had not been addressed, the hostile work environment continued to escalate, and there were no more resources in the company to get help from. Mr. Wuertzer labeled her complaints "feminine" and "exaggerated." In addition, Plaintiff's supervisors told her to "enjoy the vacation," "I could sure use another vacation," and "the stress gets to everyone."

25. On September 13, 2016, Plaintiff sent an email to Ronald Fairrow, Director of Human Resources, to complain about the working conditions. Plaintiff explained the constant discrimination and retaliation interfered with Plaintiff's ability to perform her job and constituted harassment. Mr. Fairrow forwarded Plaintiff's complaint to Jeff Nagle, Manager of Labor and Employee Relations.

26. On September 14, 2016, Plaintiff complained to Mr. Weigle about escalating discrimination, harassment and retaliation by Ian Schirner, Supervisor. Plaintiff complained that Mr. Schirner's behavior caused severe panic and anxiety, sweating, and affected her ability to perform her job.

27. Plaintiff met with Mr. Nagle on or about September 15, 2016. At the start of the meeting, Mr. Nagle informed Plaintiff that he represented upper management and their best interests, not hers.

28. During the meeting on or about September 15, 2016, Plaintiff complained that her excessive workload created safety issues. Plaintiff also complained to Mr. Nagle about the severity of the ongoing hostile atmosphere and discrimination. Mr. Nagle labeled

Plaintiff's complaints as her being "paranoid" and/or "sensitive." Plaintiff also complained that the discrimination, harassment and retaliation negatively impacted her health. Plaintiff complained that she had to take FMLA because of the discrimination, harassment and retaliation. Plaintiff complained that the discrimination, harassment and retaliation caused her to have severe fatigue, shaking, body is shutting down, blurry vision, losing ability to communicate, heart racing, insomnia, nausea and tunnel vision.

29. Mr. Nagle agreed to investigate Plaintiff's complaints regarding her workload, but he would not agree to investigate her complaints of discrimination at that time. When Plaintiff expressed concern that the discrimination was severe and needed immediate attention, Mr. Nagle indicated that he needed to receive all of Plaintiff's evidence of discrimination prior to initiating an investigation.

30. Mr. Nagle changed Plaintiff's reporting manager from Andrew Wuertzer to Jared Harston, but her working conditions became worse.

31. Plaintiff was off work for FMLA-qualifying medical leave because of the hostile work environment on September 21 - October 5, 2016. Plaintiff required additional time off November 3, 2016, November 11, 2016, November 18-19, 2016, December 2, 2016, December 9-10, 2016 December 16, 2016, and December 22, 2016.

32. When Plaintiff returned to work after medical leave, she experienced an increased hostile working environment. In addition to assigning an unachievable workload, Plaintiff's supervisors would no longer watch her workload when she left her work area for breaks.

33. On or about October 1, 2016, Plaintiff submitted documentation for medical leave from her physician.

34. On October 14, 2016, Plaintiff complained about safety concerns to Jim O'Neil, Mr. Wuertzer and Greg Clark, all shift supervisors. Plaintiff showed Mr. Wuertzer and Mr. Clark her excessive workload assigned by them, and she was setup to fail. Plaintiff explained this caused the hostile work environment, which forced her to go on medical leave. Mr. Wuertzer walked away without saying anything. Plaintiff informed Mr. Clark that she had attempted to get assistance with her workload for months without support from management. Plaintiff complained that the workload, discrimination, harassment and retaliation caused severe fatigue and incapacitation. Mr. Clark stated that they could discuss it later, but he never addressed Plaintiff's complaints.

35. On Plaintiff's shifts during October 2016, Plaintiff's supervisors scrutinized her work, assigned her an unachievable workload, refused to assist her when asked, and withheld resources for Plaintiff to perform her job. Plaintiff's supervisors alleged that Plaintiff created conflicts with her peers. In addition, Plaintiff's supervisors assigned her workload due upon her arrival for her shift, an impossible standard that created safety issues, because Plaintiff could not comply with FAA regulations. When Plaintiff's supervisors assigned her an excessive, unsafe workload, she noted it in her daily monitor log or SocChat, Defendant's instant messaging system.

36. On or about November 1, 2016, Plaintiff followed-up with Mr. Nagle regarding her complaints of discrimination. Mr. Nagle refused to address the issue of discrimination and labeled Plaintiff's complaints a "perceived workload issue."

37. After Plaintiff complained to Mr. Nagle, her work environment continued to deteriorate throughout November and December 2016. Her supervisors continued to assign her an unachievable workload and refused to provide assistance when she asked. Plaintiff would

then be disciplined for failing to meet her workload. Plaintiff's supervisors would assist male Dispatchers, and male Dispatchers would not be disciplined. Similarly situated male dispatchers were not assigned similar workloads with unachievable due times and would not be held to the same policy standards.

38. During or about November 2016, Plaintiff complained separately to Mr. Weigle and Mr. Harston about the hostile work environment impacting her health. Plaintiff complained that she had to take FMLA because of the discrimination, harassment and retaliation. Plaintiff complained that she experienced severe fatigue, shaking, body is shutting down, blurry vision, losing ability to communicate, heart racing, insomnia, nausea and tunnel vision.

39. On or about November 6, 2016, Plaintiff noted changes in the software used as the foundation for her job duties. When Plaintiff asked Mr. Weigle about the changes in the software, he stated that she would be trained on it sometime in the future. On November 13, 2016, Plaintiff was disciplined for not knowing changes to the software for which she previously requested to be trained.

40. On or about November 17, 2016, Plaintiff emailed the Dispatchers and her supervisors that she "expect[ed] a workflow carry over due to weather, staffing, and workflow assigned" Plaintiff denied that the carryover was due to her "release frequency or choosing not to follow" policies and procedures. Plaintiff complained that the carryover was "[o]ut of [her] control."

41. In response to Plaintiff's email, Mr. Harston angrily advised Plaintiff to have supervisors perform her work if she could not, even though her supervisors had overloaded her workload in the first place and repeatedly refused to assist her in the past. Plaintiff

complained that the workload was due to ongoing discrimination and ignoring her complaints and she was trying her best. She explained that when there was no interference, she was capable of performing her job. When her supervisors intentionally interfered with her workload and other conditions of employment, however, she would not succeed.

42. On December 4, 2016, Plaintiff's supervisors refused to train her on an unfamiliar assignment so she had to request training from her peers. A male coworker provided Plaintiff with information essential to safely perform her duties.

43. On December 7, 2016, Plaintiff was called to an investigatory disciplinary meeting for December 8, 2016. NetJets cancelled the meeting because Mr. Nagle could not attend.

44. On December 8, 2016, Plaintiff again complained to Mr. Weigle about the unachievable workload compared to her male colleagues, as well as supervisors refusing to assist her as necessary. Plaintiff complained that she was being retaliated against for her prior complaints of discrimination. Plaintiff complained that her complaints of discrimination were being ignored, causing the discrimination and retaliation to escalate, which damaged Plaintiff's health and performance. Plaintiff complained that she could barely work a shift without feeling symptoms of a heart attack, severe anxiety, chest pain, and unable to concentrate.

45. On December 12 and 16, 2016, Plaintiff's workload was unachievable upon her arrival. Her supervisors refused to assist her.

46. On December 12, 2016, Plaintiff complained to Mr. Weigle that management's failure to stop the discrimination, harassment and hostile work environment negatively impacted her health and caused her to take FMLA leave. Plaintiff complained the discrimination,

harassment and hostile work environment caused her to experience trauma like symptoms, specifically identifying uncontrollable shaking, sudden vomiting, body is shutting down, blurry vision, body pains, heart racing, excessive sweating and nervousness, and insomnia due to mind racing.

47. On December 17, 2016, Plaintiff again complained to Mr. Weigle about the discrimination and retaliation by NetJets. Plaintiff also complained that no one investigated her complaints of discrimination and retaliation. Plaintiff reminded Mr. Weigle of the negative impact the discrimination and retaliation had on her health.

48. On December 17, 2016, Mr. Weigle emailed Plaintiff notice of a disciplinary investigation meeting scheduled for December 20, 2017.

49. Plaintiff used FMLA for December 20, 2017 so the disciplinary investigation meeting was cancelled.

50. With nineteen (19) minutes advance notice, Mr. Weigle re-scheduled a disciplinary investigation meeting for December 22, 2016. Plaintiff informed Mr. Weigle that she felt unsafe attending the meeting given the past harassing behavior of her supervisors. Plaintiff also feared attending the meeting without the Union President, Paul Suffoletto, who had been representing Plaintiff throughout her complaints of discrimination and safety. Plaintiff did not refuse to attend the meeting. Mr. Weigle retrieved a union steward, not Mr. Suffoletto, and held an impromptu meeting at Plaintiff’s desk. The union steward was a dispatcher and subordinate of Mr. Weigle.

51. Mr. Weigle stated that he was “tired of the ongoing back and forth with” Plaintiff. When Plaintiff questioned whether he meant her prior complaints of discrimination and retaliation, Mr. Weigle stated, “Whatever you want to call it, I’m tired of it. Give me your

badge." When Plaintiff questioned Mr. Weigle about the reason for her termination, Mr. Weigle stated, "Insubordination."

52. After Plaintiff's termination, Defendant hired three (3) male Dispatchers.

53. Plaintiff's supervisors treated her differently than her similarly situated non-disabled, male coworkers, including, but not limited to, the following:

a. During or about March 2016, John Tipton, Supervisor, set up the phones so that Plaintiff received everyone's telephone calls, making Plaintiff's workload unachievable. Plaintiff was told that she was "letting the team down" and was disciplined for failing to meet standards. Jim Williamson, a male Dispatcher, had his phone off and was not held to the same standard as Plaintiff.

b. On separate occasions during or about April 2016, male dispatchers, including Michael Thaxter, Alex Childres, Greg Strohmeyer, Sean Wilson, Jim Williamson, and Greg Mast arrived to work at the same time as Plaintiff. Plaintiff was marked late, while all of the male dispatchers were marked on time.

c. As a result of Plaintiff's alleged tardiness, she received a suspension. During her suspension, she was not permitted to attend a training flight essential to performing her job. Sean Wilson, a male Dispatcher who threatened to "blow up the flight center," was allowed to complete inflight training even though the threat was reported to management.

d. During June 2016, Plaintiff was disciplined for not completing her workload. She sought assistance from Mr. O'Neil, but he refused to help her and, instead, assisted two male dispatchers.

e. During July 2016, Ian Schirner, Manager of Flight Dispatch, scrutinized Plaintiff

and her work. When Plaintiff complained about her workload, Mr. Schirner complained, "No one else is busy! Your peers are complaining about having to do your work. No need to be an emotional female!" When Plaintiff experienced dizziness, shaking, tunnel vision, racing heartbeat, shortness of breath and cramping, she stepped away from her desk to eat and use the restroom. Mr. Schirner accused Plaintiff of being "insubordinate."

f. During July 2016, Mr. Schirner advised Plaintiff that she was unable to leave her desk to use the restroom, eat or take a break until she met his expectations. Mr. Schirner allowed Plaintiff's male coworkers to move freely. If Plaintiff's male coworker needed assistance, Mr. Schirner would assist him, but not Plaintiff.

g. During July 2016, when Plaintiff left behind eight unfinished flights in her workload, Mr. Harston yelled at her in front of other staff, alleging that she violated policy. One of Plaintiff's male dispatcher coworkers left behind seven unfinished flights in his workload, but Mr. Harston did not berate him in front of staff or discipline him. Plaintiff's male coworker questioned why supervisors only attacked her.

h. On another occasion in July 2016, Plaintiff received a verbal warning about leaving behind a workload as violating policy but the same male coworker did not receive a verbal warning for leaving behind a workload.

i. On multiple occasions, when Plaintiff inquired about regulations, company software updates, etc., her supervisors refused to provide her with the information, stating that she did not need to know the information. When Plaintiff's male colleagues asked questions, they received answers.

j. Plaintiff's supervisors would pass out work assignments at unscheduled times. Her supervisors would not provide Plaintiff an assignment, forcing her to approach her supervisors to obtain her work assignment. When Plaintiff asked her supervisors for an assignment, they mocked her.

k. On one occasion, Plaintiff questioned Ms. Miller why she had received her third work assignment of the day and asked for assistance to identify the flights for which she was responsible. Ms. Miller looked up from her personal conversation with Mr. O'Neil, rolled her eyes at Plaintiff, and ignored her request for assistance. When Plaintiff's male coworkers asked for assistance from Ms. Miller, she was attentive. Ms. Miller would flirt and provide a detailed explanation of the assignment.

l. On or about September 13, 2016, a male dispatcher neglected to calculate the proper weight and balance for an aircraft, which is a fundamental job duty and a breach of FAA regulations and safety violations. The male dispatcher was not held to the same standards as Plaintiff. The male dispatcher was not disciplined for the failure, which could have resulted in fatalities.

m. During October 2016, as Plaintiff's workload increased, her supervisors refused to provide support, and the due time for her workload decreased. In contrast, Plaintiff's male coworkers openly watched YouTube videos.

n. During October 2016, one of Plaintiff's male coworkers arrived late to work but was not marked tardy. Plaintiff arrived on time and was marked ten (10) minutes late.

o. When Plaintiff complained, the retaliation only increased.

54. On or about May 4, 2017, Plaintiff dual filed a Charge of Discrimination with the Ohio Civil Rights Commission ("OCRC") and the EEOC, Charge No. 22A-2017-01923F/532-2017-00774, alleging (1) disparate treatment because of her disability and sex; (2) a hostile work environment; and (3) retaliation for filing complaints of discrimination and taking medical leave because of her disability.

55. Plaintiff received a right to sue letter from the EEOC dated May 8, 2018, attached hereto as Exhibit 1.

**COUNT I: SEX DISCRIMINATION, DISPARATE TREATMENT**
**TITLE VII, 42 U.S.C. § 2000e-2(a)(1)**

56. Plaintiff incorporates, as if fully restated herein, the foregoing paragraphs.

57. Plaintiff is a member of a protected class because she is female.

58. Plaintiff was qualified for the Dispatcher position.

59. Plaintiff suffered adverse actions, including but not limited to, heightened scrutiny of Plaintiff's work, assignment of an excessive and unachievable workload, unjustified discipline, and termination of Plaintiff's employment on December 22, 2016.

60. Defendant replaced Plaintiff with a male Dispatcher because Defendant hired three male Dispatchers after Plaintiff's termination and/or Defendant treated similarly situated male employees more favorably than Plaintiff as detailed in the Complaint.

61. Defendant discriminated against Plaintiff because of her sex in violation of 42 U.S.C. § 2000e-2(a)(1).

**COUNT II: SEX DISCRIMINATION, HOSTILE WORK ENVIRONMENT**
**TITLE VII, 42 U.S.C. § 2000e-2(a)(1)**

62. Plaintiff incorporates, as if fully restated herein, the foregoing paragraphs.

63. Plaintiff is a member of a protected class because she is female.

64. Plaintiff was subjected to unwelcome harassment because of her sex as detailed in the Complaint.

65. The harassment unreasonably interfered with her work performance by creating an intimidating, hostile and/or offensive work environment.

66. Plaintiff repeatedly complained about the harassment, but Defendant failed to take any remedial action.

67. Defendant is liable for the hostile work environment pursuant to 42 U.S.C. § 2000e-2(a)(1).

**COUNT III: DISABILITY DISCRIMINATION**
**ADA, 42 U.S.C. § 12112(a)**

68. Plaintiff incorporates, as if fully restated herein, the foregoing paragraphs.

69. Plaintiff has a disability as defined by 42 U.S.C. § 12102(1).

70. Plaintiff was qualified to perform the essential functions of the Dispatcher position.

71. Plaintiff suffered adverse actions, including but not limited to, heightened scrutiny of Plaintiff's work, assignment of an excessive and unachievable workload, unjustified discipline, and termination of Plaintiff's employment on December 22, 2016.

72. Defendant replaced Plaintiff with a non-disabled Dispatcher when it hired three non-disabled Dispatchers after Plaintiff's termination and/or Defendant treated similarly situated non-disabled employees more favorably than Plaintiff as detailed in the Complaint.

73. Defendant discriminated against Plaintiff because of her disability in violation of 42 U.S.C. § 12112(a).

**COUNT IV: RETALIATION FOR SEX DISCRIMINATION COMPLAINTS**
**TITLE VII, 42 U.S.C. § 2000e-3**

74. Plaintiff incorporates, as if fully restated herein, the foregoing paragraphs.

75. Plaintiff engaged in protected activity by repeatedly complaining about sex discrimination to Defendant's management.

76. Plaintiff suffered adverse actions, including but not limited to, heightened scrutiny of Plaintiff's work, assignment of an excessive and unachievable workload, unjustified discipline, and termination of Plaintiff's employment on December 22, 2016.

77. There is a causal connection between the adverse actions and Plaintiff's protected activity.

78. Defendant retaliated against Plaintiff because of her complaints of sex discrimination and hostile work environment in violation of 42 U.S.C. § 2000e-3.

**COUNT V: RETALIATION FOR TAKING MEDICAL LEAVE FOR DISABILITY ADA, 42 U.S.C. § 12203**

79. Plaintiff incorporates, as if fully restated herein, the foregoing paragraphs.

80. Plaintiff engaged in protected activity when she took medical leave for her disability.

81. Plaintiff suffered adverse actions, including but not limited to, heightened scrutiny of Plaintiff's work, assignment of an excessive and unachievable workload, unjustified discipline, and termination of Plaintiff's employment on December 22, 2016.

82. There is a causal connection between the adverse actions and Plaintiff's protected activity.

83. Defendant retaliated against Plaintiff for taking medical leave for her disabilities in violation of 42 U.S.C. § 12203.

**WHEREFORE,** Plaintiff Molly La Fond prays for judgment in her favor, injunctive relief, reinstatement or front pay, back pay, compensatory and non-economic damages exceeding $75,000, punitive damages, liquidated damages, pain and suffering, attorneys' fees, costs, pre-

and post-judgment interest, and any other relief to which she may be entitled and which this Court may deem appropriate and equitable.

Respectfully Submitted,

*s/Laren E. Knoll*
Laren E. Knoll (0070594)
The Knoll Law Firm, LLC
7240 Muirfield Drive, Suite 120
Dublin, Ohio 43017
Telephone: (614) 372-8890
Facsimile: (614) 452-4850
Email: lknoll@knolllaw.com
*Trial Attorney for Plaintiff Molly La Fond*

**JURY DEMAND**

Plaintiff requests a trial by a jury of eight (8) persons on all issues triable by a jury.

*s/Laren E. Knoll*
Laren E. Knoll (0070594)
The Knoll Law Firm, LLC
*Trial Attorney for Plaintiff Molly La Fond*